Affirmed; En Banc Rehearing Granted; Majority and Dissenting Opinions on
Rehearing filed July 17, 2003, are Withdrawn; Majority and Dissenting Opinions
on En Banc Rehearing filed November 24, 2004









 



Affirmed; En Banc Rehearing Granted; Majority and
Dissenting Opinions on Rehearing filed July 17, 2003, are Withdrawn;  Majority and Dissenting Opinions on En Banc
Rehearing filed November 24, 2004.

 

In The

 

Fourteenth Court of Appeals

____________

 

NO. 14-01-00432-CV

____________

 

WALLACE and DEANNA
DYALL,
Appellants

 

V.

 

SIMPSON PASADENA
PAPER COMPANY,
Appellee

 



 

On Appeal from the 61st
District Court

Harris County, Texas

Trial Court Cause No. 99-09337

 



 

MAJORITY 
OPINION  ON  EN 
BANC  REHEARING








This appeal arises from a claim of damages for injuries
allegedly sustained by the inhalation of chlorine dioxide vapors by an employee
of an independent contractor hired to make repairs on a leaking flange at a
paper mill.  Wallace Dyall, an employee
of Industrial Pipe and Plastic, Inc. (AIPP@), and his wife, Deanna Dyall
(collectively, ADyall@), sued the owner of the mill, Simpson Pasadena Paper Company
(ASimpson@), asserting claims for negligence,
gross negligence, and negligence per se. 
Simpson filed for summary judgment, arguing that it exercised no control
over the repairs being done on its property, and thus, under Chapter 95 of the
Texas Civil Practice and Remedies Code, could not be held liable.  The trial court granted a take-nothing
summary judgment in favor of Simpson.  On
original submission, a divided panel of this court affirmed the trial court=s judgment.  On rehearing, a divided panel again affirmed
the trial court=s judgment.  On
rehearing en banc, we withdraw our panel opinion on rehearing of July 17, 2003,
and substitute the following majority and dissenting opinions.

In five points of error, Dyall contends the trial court erred
in granting summary judgment because (1) genuine issues of material fact exist
as to the level of control exercised by Simpson over the repair operations for
which Wallace Dyall was hired, and (2) he asserted a claim that was not
precluded by the operation of Chapter 95. 
We affirm.








The summary judgment record reflects that
on April 19, 1998, Bruce
Stiles, a shift supervisor employed by Simpson, was engaged in a routine
inspection of the facilities when he noticed a pinhole leak in a pipe near the
pine bleaching plant.[1]  Stiles knew the pipe supplied the plant with
chlorine dioxide, a bleaching agent.  He
observed the chemical spraying onto a concrete pad where it was vaporizing and
forming a green gas cloud symptomatic of a chlorine dioxide leak.  Stiles called the bleach plant operator and
ordered him to shut down the facility. 
The pipe was then purged with water to remove the chlorine dioxide, and
the affected area was washed down. 
However, due to a leaking valve, the flow could not be entirely stopped,
but the leak apparently diminished from a Aspray@ to a Adribble.@ 
Stiles also observed the liquid dripping from the pipe was now both
clear and odorless.  Except in very low
concentrations, chlorine dioxide is yellow and pungent.  Thus, Stiles assumed the liquid was primarily
water and that any trace of chlorine dioxide in the water was at such low
levels it presented no significant respiratory hazard.[2]

The following day, at approximately 10:45 a.m., Joey Carter,
a fiberglass technician, and his helper, Wallace Dyall, employed by Industrial
Pipe and Plastic (IPP), were dispatched to the Simpson Pasadena Paper Company
to repair the leak.  Upon arriving at the
gate, at approximately 11:00 a.m., an unidentified gentleman directed Carter and
Dyall to a small office building on the plant complex where they met Jerry
Elleven who said he was having a problem with a leaking flange.  He also said replacement of the flange would
require shutting down the plant, so he asked Carter and Dyall if they could
stop the leak without replacing the flange. 
According to Dyall, no safety warnings were administered, no safety data
sheets were given to him, and he Awas given the impression . . . that
there was no danger to us concerning the substance that was leaking.@[3]








Dyall admitted, however, that he could not recall whether
Simpson personnel told him the pipe might contain traces of chlorine dioxide.[4]  Carter, also, could not recall whether
Simpson employees ever identified the substance leaking from the flange.  Both men acknowledged, however, that someone
at the plant may have told them the substance leaking from the pipe contained
chlorine dioxide.  Moreover, it is
undisputed that within 25 feet of the leaking flange a warning sign attached to
a support beam said, AChlorine Dioxide.@ 
The sign also recommended chemical goggles, a face shield, ventilation,
no smoking, and a scuba gas respirator. 
Carter also admitted that, as Dyall=s supervisor, it was his
responsibility to evaluate the situation and determine the toxic hazards
present at each job site.








Before proceeding to the site of the leaking flange, Elleven
asked Carter and Dyall if they had full air packs.  A Afull air pack@ has a  clear face shield and an air tank which
supplies the wearer with air much like an underwater diver.  Carter informed Elleven that they had full
air packs Aback at the shop.@ 
According to Dyall, Elleven said, AWell, that=s all right.  I don=t think you=ll need them.@ 
Elleven then directed Carter and Dyall to Athe safety guy@ to pick up two throw-down
packs.  A Athrow-down pack@ is also known as an emergency escape
respirator.  It is not designed for
sustained use, but is to be clipped to the wearer=s belt.  In the event of a toxic gas leak, the wearer
is advised to insert the breathing tube in his mouth, use the nose clip to seal
his nose, and immediately leave the area. 
While the user escapes to a safe area, all his air is filtered through a
charcoal filter.

Carter and Dyall reported to the Simpson safety director who
gave them two emergency escape respirators. 
Carter mentioned to the safety director that he and Dyall had  half-face respirators in their truck.  A half-face respirator covers the mouth and
nose and is usually used in conjunction with goggles.  The user=s air is filtered through specially
designed canisters attached to the respirator, much like a gas mask.  As a safety precaution, however, the Simpson
employee insisted that Carter and Dyall also have escape respirators with them
before entering the area of the pine bleaching plant.  Further, he advised Carter and Dyall that if
they should smell any unknown odor, they should immediately don their escape
respirators and leave the area.

Thereafter, Carter and Dyall drove their truck to the site of
the leaking flange where they observed a Simpson employee with a water hose
washing what appeared to be a thick white soap foam down a nearby drain.  Before proceeding into the area, Carter
asked, AIs it safe for us to go in [the foam]
or do we need rubber boots?@  The employee told
Carter he did not need boots and told him he could enter the area.  He also identified the substance he was
washing down the drain, but Carter could not remember the name of the substance
at the time of his deposition.[5]








Upon inspecting the leak, Carter noticed a half-inch pipe
running from the pine bleaching plant.  A
greenish-yellow liquid (consistent with the appearance of chlorine dioxide) was
dripping from a crack between the threads and a flange.[6]  The pipe and flange were located no more than
three inches above a concrete pad.  As
the liquid dripped on the pad, it was immediately diluted by water from a : inch hose and washed into a
drain.  Although Simpson employees were
working only a few feet from the leak, they wore no protective
paraphernalia.  Perceiving no hazard,
Carter and Dyall left their respirators in the truck.  They then tried to contain the leak with a
substance known as Hydro-plug.  Other
than gloves and goggles, they wore no protective gear while they worked.  Although his testimony was strongly
controverted, Dyall alleges he got the liquid on his hands, arms, legs, and
knees.[7]








At some point during their repair efforts, Carter noticed a
pinhole leak about four feet from the broken flange.  Every ten or fifteen seconds, a drop of
liquid would fall to the ground and instantly vaporize making a small white
cloud.  Carter alerted Simpson employees
working in the area to the new leak and asked, AIs it the same thing or is it
something else?@  A Simpson employee
inspected the leak and said, AOh, it=s all inCit=s the same pipe.@ 
Reassured that the new leak was nothing more than the same liquid
leaking from the flange, Carter and Dyall returned to working on the
flange.  In his deposition Carter
acknowledged that the liquid dribbling from the broken flange and the liquid
dripping from the nearby pinhole leak had no discernible odor.  The Hydro-plug mixture, however, releases an Aammonia-chlorine type smell,@ that burns the nose.  Carter admitted that the only smell of
chlorine that day came from the Hydro-plug mixture.  In fact, Dyall began coughing and choking on
the fumes of the Hydro-plug mixture, and Carter further admitted that he and
Dyall should have worn their half-face respirators to protect them from the gases
of their own Hydro-plug mixture.[8]








After working an hour and a half, it became apparent the leak
could not be stopped using Hydro-plug. 
Records indicate that at approximately 12:30 p.m., the entire pine
bleaching plant was shut down.  Once the
pine bleaching plant was shut down and the flow of the liquid was stopped,
Simpson advised Carter and Dyall that it would have its own plumbers replace
the broken flange.

As Carter and Dyall prepared to leave the area, both men
became nauseous, and they each vomited. 
Carter and Dyall then returned to their shop to pick up some flange
plugs which the Simpson employees needed to replace the flange.  Before returning to the Simpson facility,
Dyall vomited again.[9]

After obtaining the necessary flange plugs, Carter and Dyall
returned to the Simpson facility. 
However, before entering the work area, they donned their half-face
respirators for the first time.  They
delivered the flange plugs to the Simpson employees who were already engaged in
replacing the flange.  Carter noticed the
Simpson employees were still working without the benefit of respirators or air
packs.  Apparently, they suffered no ill
effects.  Carter and Dyall returned the
throw-down packs to Simpson and went back to the IPP office.

The following day, Dyall reported to work, but was not
feeling well.  IPP sent him to a company
physician.  Dyall alleges he has had
severe respiratory problems since his exposure to the leaking flange.

Standard of
Review








The standard we follow in reviewing a summary judgment is
well-established. The movant for summary judgment has the burden to show that
no genuine issue of material fact exists and that he is entitled to judgment as
a matter of law.  Tex. R. Civ. P. 166a(c); Lear Siegler, Inc. v. Perez,
819 S.W.2d 470, 471 (Tex. 1991); Nixon v. Mr. Property Management Co.,
690 S.W.2d 546, 548B49 (Tex. 1985).  When
deciding whether there is a disputed material fact issue precluding summary
judgment, we treat proof favorable to the non-movant as true, and we resolve
any doubts in his favor. Nixon, 690 S.W.2d at 548B49; Montgomery v. Kennedy, 669
S.W.2d 309, 311 (Tex. 1984).  A
defendant, as movant, is entitled to summary judgment if he either disproves at
least one essential element of each of the plaintiff=s causes of action or establishes all
the elements of an affirmative defense.  Am.
Tobacco Co. v. Grinnell, 951 S.W.2d 420, 425 (Tex. 1997).

Chapter 95 of the
Texas Civil Practice and Remedies Code

Even before the adoption of Chapter 95, a
Texas property owner was not generally subject to liability for injuries
sustained by an independent contractor because the owner had no duty to see
that an independent contractor performed his work in a safe manner.  Redinger v. Living, Inc., 689 S.W.2d
415, 418 (Tex. 1985).  Simply stated, it
was well established that the owner or occupier of property was not an
insurer.  Thus, where activity leading to
injury was conducted by, and was under the control of, an independent
contractor, and where the danger arose out of the activity of the independent
contractor=s staff, the responsibility fell upon the
independent contractor, and not the owner or occupier of the property.  Abalos v. Oil Dev. Co. of Texas, 544
S.W.2d 627, 631 (Tex. 1976).








However, two exceptions to this general
rule also evolved in Texas jurisprudence. 
Both exceptions arose from an owner=s failure to keep
the premises safe, namely: (1) dangers arising from an activity on the
premises,[10]
and (2) those arising from a premises defect.[11]  Williams, 952 at 527.  The evolution of our jurisprudence has
produced conflicting opinions sometimes detrimental to the public policy of
minimizing work-related injuries.

For example, in Tovar v. Amarillo Oil
Co., the owner of an oil lease hired an independent contractor to drill a
well.  692 S.W.2d 469 (Tex. 1985).  By contract, the owner required the
contractor to have a blowout preventer and specified that the kill line should
not be used for a fill line on the blowout preventer.  The contractor disregarded this safety
precaution.  The owner was aware of the
deviation and did not order the contractor to leave the premises.  Thus, when the well blew out and injured one
of the contractor=s employees, the owner was liable for negligently
failing to exercise reasonable care in supervising the contractor=s activity.  Id. at 470.

Likewise, in Lee Lewis Const., Inc. v.
Harrison, 70 S.W.3d 778 (Tex. 2001), a general contractor was held to have
retained the right to control safety on the job site when it required its
subcontractors to adhere to its safety rules or face expulsion from the job
site.  The safety regulation included the
mandatory use of a lanyard or lifeline when working in high places to prevent
injuries from falls.  One of the
subcontractor=s employees violated the safety rules, did
not attach his lanyard to a beam, and subsequently fell to his death while
attempting to insulate a tenth floor window on a construction project.  Again, the Supreme Court held there was more
than a scintilla of evidence that the general contractor had Aretained the right
to control fall-protection systems on the jobsite.@  Id. at 784.  Thus, the general contractor was liable for
the death of its subcontractor=s employee.








In both of the aforementioned cases, the
owner or general contractor would have been in a more legally advantageous
position if it had not promulgated safety rules and procedures.  The effect of these decisions is arguably
antithetical to public policy.  A[T]he employer of
an independent contractor should not be forced to choose between the risk of
injury from not intervening in the contractor=s work [and] the
risk of liability from such intervention.@  Id. at 793 (Hecht, J., concurring).

Other opinions, however, have favored the
public policy of protecting workers.  For
example, in Koch Refining Co. v. Chapa, 11 S.W.3d 154 (Tex. 1999), the
Supreme Court rejected the argument that the premises owner had retained
control over the safety requirements of its independent contractor by having
its on-site safety employee observe the work of its contractor.  The court concluded Athat a premises
owner, merely by placing a safety employee on the work site, does not incur a
duty to an independent contractor=s employees to
intervene and ensure that they safely perform their work.@  Id. at 157.

Likewise, in Dow Chemical Co. v. Bright,
89 S.W.3d 602 (Tex. 2002), an employee of Gulf States, Inc., an independent
contractor, sought damages from Dow Chemical Company, the premises owner, for
injuries sustained in a work related accident caused by the actions of another
Gulf States employee.  The plaintiff
argued Athat Dow had a
contractual right to control the premises because Dow required its independent
contractors to comply with the safety rules and regulations promulgated by Dow
in its Safety and Loss Prevention Manual.@  Id. at 607.  The Texas Supreme Court rejected the
contention stating, Ait is not enough that the premises owner
has merely a general right to order the work stopped . . . [t]o hold otherwise
would deter general contractors from setting even minimal safety standards.@  Id. at 607B08.

In addition to public policy
considerations, there are other reasons to question the wisdom of imposing
liability upon the property owner for injuries sustained by independent
contractors.  First, Athe contractor has
often been hired for its expertise in the work to be done and its superior
ability to see that the work is done safely.@  Lee Lewis Const., 70 S.W.3d at 796
(Hecht, J., concurring).  Second, A[a]n employer=s liability for
accidents should not increase the harder he tries to ensure that his
independent contractors work safely and decrease the less he cares what
happens.@  Id.








The rationale of subjecting employer=s to liability for
injuries sustained by independent contractors is also inconsistent with our
modern system of worker=s compensation.  First, the employment of Aa subscribing
independent contractor presumably includes the cost of providing worker=s compensation
coverage related to the work, and the contractor=s employer who
pays it should have the same protection from extra liability for job-related
injuries to the contractor=s employees that
the contractor has.@  Id.
at 795.  Second, an Aemployer should
not be exposed to greater risk of liability for wisely entrusting peculiarly
dangerous work to a better-skilled independent contractor than if he had
undertaken the job with his own less capable employees.  Id. at 796.  Finally, a Aworker should not
have greater rights as an employee of an independent contractor than he would
have as an employee of the contractor=s employee.@  Id.

These incongruities were largely rectified by Chapter 95 of
the Texas Civil Practice and Remedies Code which was part of a sweeping
tort-reform package.[12]  It was enacted because the legislature
recognized that property owners often want to hire someone with expertise to
repair or renovate some improvement on their property.  Kelly v. LIN Television of Texas, L.P.,
27 S.W.3d 564, 570 (Tex. App.CEastland 2000,
pet. denied).  Sometimes the contractor
is hired to remedy a dangerous condition on the property and the work,
therefore, is potentially hazardous. 
Chapter 95 provides that a property owner is not liable for the personal
injury, death, or property damage to a contractor or his employees who
construct, repair, renovate, or modify an improvement to real property,
including injuries arising from the failure to provide a safe workplace unless:

(1) the property owner exercises or
retains some control over the manner in which the work is performed, and

(2) the property owner had actual knowledge of the danger
or condition resulting in the injury and failed to adequately warn.

Tex. Civ. Prac. & Rem.
Code Ann. ' 95.003 (Vernon 1997).








The first prong of the statutory exception
is a codification of the holding in Redinger v. Living, Inc. which
adopted the Restatement (Second) of Torts, Sec. 414 and comments.[13]  The second prong forecloses the plaintiff=s reliance on  Aconstructive
knowledge@ of the property owner regarding a
dangerous condition.[14]  In other words, the burden now rests upon the
plaintiff to show both (1) control and (2) actual knowledge of the
danger.  These are two independent and
necessary conditions to the imposition of liability.[15]  The owner may be aware of the danger, but
exercise no control, or he may exercise control and have no actual knowledge of
the danger; in either instance, the owner is statutorily shielded from
liability.[16]









Simpson=s Motion for
Summary Judgment

In its Amended Second Motion for Summary
Judgment, Simpson argued it was immune from liability under Chapter 95.003 of
the Texas Civil Practice and Remedies Code because Carter and Dyall Ahad complete
control over the repairs that they were hired to perform, and . . . Simpson did
not exercise or retain any control over the repair operation.@

In his reply, Dyall argued that Simpson
had, in fact, exercised control because ADyall was not told
that he may be exposed to chlorine dioxide at [its] plant, apparently because
[Simpson=s] shift
supervisor, Bruce Stiles, did not think there was enough chlorine dioxide in
the leak to hurt Mr. Dyall, since he did not smell it.@  Dyall also argued that Simpson Afailed to inform
[him] of what chemical he would be exposed to when [Simpson] called for work to
be done@ and A[Simpson] lured
[Dyall] into a false sense of security in regard to working with [Simpson=s] mystery
chemical . . . [in that Simpson=s] employees were
not wearing their air packs when they pointed out the leaking flange for
[Dyall] to work on.@

Control








On appeal, Dyall concedes that Simpson exercised no control
over the repair work, but he contends that Simpson had responsibility for Asafety matters@ in the area to be repaired, and,
thus, he Awas not entirely free to do the work
his own way.@ 
This raises an issue as to whether control over Asafety matters@ is within the scope of the statute=s requirement of Acontrol over the manner in which the
work is performed.@  Tex. Civ. Prac. & Rem. Code Ann. ' 95.003 (Vernon
1997).  As discussed above, it would be
harmful to worker safety and, thus, to public policy, to hold that control over Asafety matters@ subjects an owner to liability
because such a holding would encourage owners to divorce themselves from all
safety concerns.  Unless, the owner
imposes a safety regulation or procedure that actually causes or contributes to
the contractor=s injury, we do not deem such
regulations as Acontrol over the manner in which the work is performed.@ 
Tex. Civ. Prac. & Rem. Code Ann. ' 95.003 (Vernon
1997).  In other words, unless the owner=s Asafety@ regulation unwisely imperils the
contractor, its imposition and observance must be encouraged, not discouraged,
and cannot  reasonably be considered the
type of control the legislature envisioned as coming within the ambit of the
statute.

Here, the only Asafety regulation@ imposed by Simpson was that Carter
and Dyall carry emergency escape respirators on their belts before entering the
area of the pine bleaching plant.  This Asafety regulation@ did not imperil either man, and it
was not the cause of Dyall=s alleged injuries.  In
his appellate brief, Dyall lists sixteen alleged examples of Acontrol@ by SimpsonCnone raise a fact
issue as to whether Simpson retained or exercised control over the manner in
which Dyall=s work was to be performed.








Dyall first contends Simpson exercised
control by failing to clear the line of chlorine dioxide.  While it is certainly true that, as the
property owner, Simpson had Acontrol@ of its
facilities, this is not the type of Acontrol@ of which the
statute speaks.  Simpson undoubtedly had
the power to sell or lease its property, control access to its property, to
shut down the facilities, etc.  However,
the statute speaks of Acontrol over the manner in which the work
is performed.@  Tex. Civ. Prac. & Rem. Code Ann. ' 95.003 (Vernon
1997).  While the summary judgment evidence
shows Simpson purged the line with water in an attempt to eliminate any hazard
to Carter and Dyall, the success or failure of this procedure does not
demonstrate Acontrol over the manner in which the work
is performed.@  Id. 
Dyall plainly acknowledged in his deposition that Simpson did not
exercise any control over his work.[17]  Likewise, Carter testified, ASimpson never
advised us on how to perform our job, as far as how to lay it up, how to glass
it or how to Hydro-plug it.@








Simpson personnel were fully capable of
repairing the leak by shutting down the pine bleaching plant and replacing the
cracked flange on an empty pipe.  They
were not competent, however, to repair the crack without replacing the entire
flange while the pipe was dribbling liquid, and that is precisely why Simpson
sought the expertise of an independent contractor.  Carter apparently thought he could seal the
crack without replacing the flange.  He
further testified that it was solely his responsibility to assess the hazards
before commencing a project, and the record reflects the only inquiry Carter
made regarding protective equipment was whether he and Dyall needed to wear
boots.  Moreover, Carter testified that
he and Dyall had all the personal protection equipment they needed for this
task on the truckCthey simply chose not to use their
respirators until they began feeling ill. 
Accordingly, we find no evidence of control over the manner in which the
work was performed.

Dyall next claims that Simpson exercised Acontrol@ by providing
safety equipment, i.e., emergency escape respirators.  It is undisputed that a Simpson safety officer insisted that
Carter and Dyall carry escape respirators on their belts before entering the
pine bleaching plant area.  Admittedly,
this is some Acontrol@ over safety procedures, and where an
employer imposes a safety regulation that causes or leads to injury, the
employer=s control over the manner of work may
lead to its liability for the injury.  In
short, safety regulations imposed by the employer must not increase the
probability of injury.  Hoechst-Celanese
Corp. v. Mendez, 967 S.W.2d 354, 358 (Tex. 1998).  Here, however, Dyall does not allege that he
was injured by Simpson=s insistence that he carry an escape respirator on his belt,
and the mere existence of safety regulations does not establish actual control
over an independent contractor.  Dow
Chem. Co., 89 S.W.3d at 611.  In
other words, employers can set minimal safety standards without incurring
liability.  Hoechst-Celanese Corp. v.
Mendez, 967 S.W.2d at 358.  Those who
employ independent contractors are not Arequired to stand idly by while
another is injured or killed in order to avoid liability.@ 
Welch v. McDougal, 876 S.W.2d 218, 224 (Tex. App.CAmarillo 1994, writ denied).  Moreover, a premises owner does not incur a
duty to an independent contractor to intervene and ensure he safely performs
his work merely by placing a safety employee at the work site.  Koch Ref. Co., 11 S.W.3d at 157. 

Dyall
also alleges Simpson exercised Acontrol@ Aby instructing [him] the safety equipment provided was
unnecessary.@ 
The record, however, does not support Dyall=s allegation.  Dyall cites to two places in the summary
judgment record he contends support his assertion.  In the first instance, Carter testified:








Q.  You knew
that everybody that entered over there had to have an escape respirator?  Did you know that?

A.  Yes.

Q.  And so
whoever it was, Elleven or whoever, issued escape respirators?

A.  Yes.  And at that point I let him know C I informed him we had our own half-face that we used.

Q.  And whoever
it was, what did they say?

A.  AJust go ahead and keep it until you finish and turn it
back in before you leave.@

Q.  And that=s an escape respirator that you put on your belt?

A.  On your
belt.

Q.  And, for
example, if you=re driving out there and a pipe pops and starts
spraying, you put the escape respirator on your mouth and you run, right?

A.  Right.

Q.  That=s what it=s for?

A.  Correct.  For escapes only.

Nothing in Carter=s testimony suggests that Simpson implied, suggested, or
hinted that Carter and Dyall should not use their half-face respirators while
conducting repairs on the leaking flange.

Dyall
next cites his own testimony where he said:

Q.  What else do
you recall about that conversation with this male inside the building?

A.  He asked us
if we had full air packs.  Joey [Carter]
said, ABack at the shop.@  He said, AWell,
that=s all right.  I
don=t think you=ll need
them.@  He said, AGo to the safety guy here and he=ll give you these throw-down packs,@ and we went over there and they issued us two
throw-down packs.  We hooked them on our
belts and proceeded over to where the leak was.

*  *  *








Q.  And y=all had full air packs C

A.  I don=t know that we had them.  Joey said we had them back at the shop locked
up.

Q.  And the man
at C that was inside the building said what?

A.  He said, AI don=t think you=ll need
them anyway.  We=ll C I=ll just give you some of our packs here,@ and he took us to the safety guy which issued us two.

Q.  Who was the
safety C

A.  I don=t know his name either.  He just was C he
said, AThis is our safety.@

Q.  So he gave C strike that. 
The man that you met gave you two what?

A.  Air packs is
all I know them called by, the little thing you put in your mouth, put a clip
on your nose.

Q.  So you put a
clip on your nose and you had this other C

A.  If you need
it.  We didn=t do that.  We
had them clipped to our belts.

*  *  *

Q.  . . . Would
it be fair to say that when you received these two air packs it was your
understanding that they were to protect you and Joey from chemical exposure?

A.  I didn=t know they had any chemicals out there so I couldn=t say that either. 
He said, you know C I mean, we had respirators, but he gave us these.

Q.  You had
respirators?

A.  Yes.

Q.  Where?

A.  In the truck
with us.

Q.  Okay.  So when you and Joey arrived at the Simpson
plant, you had your respirator and he had his respirator?

A.  In our
safety bag in the truck, yes.

*  *  *








Q.  And you had
those in the truck?

A.  Yes, we did.

Q.  Any you guys
left them in the truck?

A.  Left in the truck.

Dyall=s theory seems to be that but for
Simpson=s insistence that he and Carter clip
emergency escape respirators to their belts, they might have worn their
half-face respirators while attempting to repair the leaking flange.

The record, however, does not logically support Dyall=s contention.  The summary judgment evidence shows there
were three possible means of protecting Carter and Dyall.  The first, and best method, was an air pack
with a full face shield.  Carter and
Dyall had access to this equipment, but did not bring it with them to the job
site.  Contrary to appellant=s position, Elleven=s question, by its nature, suggests
it might have been advisable to have such equipment.  When he learned that Carter and Dyall did not
have the equipment with them, he allegedly said, AWell, that=s all right.  I don=t think you=ll need them.@ 
(emphasis added).  This statement
is ambivalent on its face and cannot reasonably be construed as a command or
instruction not to use such equipment. 
In fact, it suggests the possibility that full air packs might
potentially be needed depending upon the circumstances.  Moreover, the summary judgment record shows
that at one point, Carter and Dyall left the Simpson job site, returned to
their shop to pick up parts, but still did not pick up the full air packs.

The second level of protection was a respirator covering the
lower half of the face.  Carter and Dyall
were in possession of respirators and goggles, but chose not to use the
respirators until after they both became ill. 
At no time did any Simpson employee order, command, instruct, or suggest
that Carter and Dyall should not use their respirators.








The third level of protection available to Carter and Dyall
was an emergency Athrow-down@ pack or escape respirator. 
As the record makes clear, the requirement of an escape respirator was a
minimal safety precaution.  Nothing about
the requirement of an escape respirator precludes the use of other safety
equipment.  On many construction sites,
for example, hard hats are required of all visitors as a safety precaution, but
few would argue that such a requirement prevents contractors from utilizing other
protective equipment such as gloves, safety harnesses, steel-toed boots, safety
glasses, etc. that they in their judgment deem advisable or necessary to safely
complete their task.

Dyall argues that because Simpson insisted he carry an
emergency escape respirator, he assumed he was in no danger of exposure to
toxic fumes.  However, notwithstanding
Dyall=s testimony that he did not know why
he was required to carry an escape respirator, the very fact that Simpson
insisted that he carry such a device indicates the site was potentially
hazardous.  Using the analogy of a hard
hat, if Simpson had insisted that Dyall wear a hard hat, he could not
reasonably assume there  was no danger of
falling objects or that he could walk under ladders with impunity.  To the contrary, the requirement of a hard
hat indicates that falling objects are a potential hazard.  In a similar manner, the requirement that all
visitors carry a back-up or emergency respirator puts every reasonable person
on notice that toxic vapors constitute a potential hazard.

Dyall next argues that Simpson exercised Acontrol@ by refusing Ato allow Dyall to return to the IPP
office and retrieve the proper safety equipment,@ i.e., full air packs.  This allegation, however, is a gross
distortion of the record.  To support his
contention, Dyall cites the testimony of his expert witness who, when asked if
it would have cost Simpson money to have a delay in repairing the leak said, AWell, I can=t answer >yes= or >no= absolutely, but obviously if they
have to shut down the process they=ve cost some money.@ 
From this conjecture Dyall asks us to imply that Simpson discouraged
Carter and Dyall from returning to the IPP office to get full air packs.  However, there is absolutely no evidence in
the summary judgment record that Carter or Dyall were ever discouraged from
returning to their shop to get full air packs. 
In fact, Carter testified that he was told by Simpson employees to Abe careful and don=t rush . . . [t]ake your time, get it
fixed.  Get it done right.@








Dyall next contends that Simpson exercised control by
directing him Ato use a >throw-down= pack and providing the same.@ 
As we have already observed, Simpson never directed Dyall to Ause@ a throw-down pack in lieu of his
half-face respirator.  All persons
entering the area of the pine bleaching plant were required to carry an
emergency escape respirator as a minimal safety precaution.  The device is not designed to work in, and it
is uncontroverted that Simpson did not supply the throw-down packs for Carter
and Dyall to use while performing repairs to the leaking flange.  Carter and Dyall testified that before
leaving Simpson=s facility, they returned the unused emergency
respirators.  This is consistent with the
uncontroverted testimony of Stiles, Carter, and Dyall that the throw-packs were
a safety precaution, not an element of control in how Carter and Dyall should
perform their work or what type of protection they should use.

Dyall next asserts Simpson exercised control by twice
assuring him Ait was safe to continue working
without [a] full face mask air respirator.@ 
Although he contends he was Atwice reassured,@ 
Dyall cites only the one statement by Elleven that he did not think
Carter and Dyall would need full air packs to repair the flange.  Carter frankly admitted that Simpson never
said the area around the leaking flange was Asafe.@ 
Thus, Dyall could only say Simpson implied the area was safe by
the fact that Simpson employees were working in the same area who were not
using respirators or air packs. 
Moreover, Elleven=s comment did not suggest that Carter and Dyall should not
use their half-face respirators and goggles, but, at most, indicated they would
probably not need full air packs.

Dyall next claims Simpson exercised control by authorizing
him to enter the pine bleaching plant to repair the leaking flange.  We fail to see how this constitutes any type
of control over the manner in which the work was to be performed.








Dyall next maintains Simpson exercised control by Afailing to provide a safe work place
and environment.@  Section 95.003,
however, expressly states that Athe failure to provide a safe workplace@ is not actionable unless Athe property owner exercises or
retains some control over the manner in which the work is performed@ and Ahad actual knowledge of the danger or
condition resulting in the personal injury . . . and failed to adequately warn.@ 
Tex. Civ. Prac. & Rem. Code
Ann. ' 95.003 (Vernon 1997).  Dyall would have us interpret the statute to
say that Acontrol@ is established, ipso facto,
by the property owner=s failure to provide a safe workplace.  We are not inclined to accept Dyall=s interpretation because it would
render the statute meaningless.

Dyall next alleges that Simpson exercised control by not
warning him that he would be exposed to chlorine dioxide.  Again, however, the statute provides immunity
from suit unless the property owner (1) controlled the work and (2) knew of the
danger and failed to adequately warn. 
Tex. Civ. Prac. & Rem. Code
Ann. ' 95.003 (Vernon 1997).  Thus, the statute, on its face, suggests that
the failure to warn is not synonymous with Acontrol.@ 
Moreover, Carter and Dyall both testified that Simpson might have told
them chlorine dioxide was in the pipe.








Dyall next contends Simpson exercised control Aby failing to shut the facility down
at the request of the shift supervisor for the bleach plant facility.@ 
First, this allegation misconstrues the record.  The record shows that Bruce Stiles, the shift
supervisor, ordered the pine bleaching plant to shut down when the leak was
first discovered.  The bleaching facility
was shut down and the line was then purged with water and the area around the
leak was scrubbed down.  When, on the
following day, Carter and Dyall arrived to repair the flange, the pine
bleaching plant was back in operation. 
The record does not explain how the plant resumed operation without
chlorine dioxide or whether the supply of chlorine dioxide had been
rerouted.  In any event, it is undisputed
that Simpson believed the pipe which Carter and Dyall were hired to repair was
dribbling water that potentially contained only trace amounts of chlorine
dioxide that did not present a respiratory hazard to those working in the
area.  Carter and Dyall were specifically
asked if they could repair the leaking flange while it was still
dribbling.  When it became apparent they
could not repair the flange, the pine bleaching plant was again shut down to
allow Simpson personnel to replace the cracked flange.  Thus, there is nothing in the record to
suggest that Simpson disregarded the orders of its own shift supervisor.

Second, even if Dyall=s allegation was true, we fail to see
how Simpson=s internal decision to operate or
shut down the pine bleaching plant can be characterized as Acontrol over the manner in
which the work is performed.@  Tex.
Civ. Prac. & Rem. Code Ann. ' 95.003 (Vernon
1997).  Carter and Dyall were asked if
they could repair the pipe while the pine bleaching plant was in operation and
the pipe was dribbling.  Carter and Dyall
thought they could, but as it turned out, they could not.  It was Carter=s and Dyall=s decision whether
or not to attempt a repair of the pipe while it was leaking.  This decision cannot be characterized as Acontrol@ by Simpson.

Dyall next asserts Simpson exercised
control Aby failing to
adhere to its own safety policies and provide [him] full face safety equipment
or (at least advise it was necessary).@  Dyall cites to numerous places in the record
reflecting that Simpson employees worked within five feet of Carter and Dyall
without the benefit of respirators or full air packs.  Nothing in the record before us indicates the
Simpson employees violated their own safety policies by working in the
area.  However, even if Simpson employees
had violated their own safety policies, Dyall does not explain how this act
could reasonably be construed as control over the manner in which Carter and
Dyall performed their work.

Dyall next contends Simpson exercised
control Aby supervising the
manner in which Dyall attempted to repair the leaking flange.@  First, the record indicates Dyall never
attempted to repair the leaking flange. 
Carter testified that as his helper, Dyall merely fetched tools and  mixed-up the Hydro-plug compound for
him.  Carter, alone, attempted to repair
the flange by applying the Hydro-plug mixture to the site of the leak.  Second, while Bruce Stiles dropped by from
time-to-time to check on their progress, Carter and Dyall both testified that
Stiles did not control their work or activities in any manner.  Accordingly, Dyall=s contention has
no support in the record.








Dyall next proposes that Simpson exercised
control Aby giving
clearance to [him], after a second leak, to continue working in an area leaking
toxic chemicals.@ 
Again, this characterization of the facts is a distortion of the
record.  During the course of his work on
the flange, Carter noticed a drop of odorless liquid fall to the ground every
ten or fifteen seconds a short distance from where he was working.  Carter asked Simpson employees working in the
area, AIs it the same
thing or is it something else?@  A Simpson employee determined the leak was
from the same pipe Carter was already working on and said, AOh, it=s all inCit=s the same pipe.@  Carter testified that he was never told by
Simpson employees that the area had been cleared as or declared to be Asafe.@  In fact, both Carter and Dyall admitted that
Simpson employees may have told them the liquid dripping from the pipe could
contain chlorine dioxide.  In fact, it is
hard to conceive how Carter and Dyall could be ignorant of the potential
danger: (1) they were specifically asked whether they had full air packs; (2)
they were required to carry emergency escape respirators on their belts; (3)
they were warned to leave the area immediately if they noticed any odors; and
(4) they were within twenty-five feet of a sign warning of the respiratory
danger presented by chlorine dioxide. 
Dyall could, of course, make an argument that these warnings were not
adequate to apprise him of the danger. 
However, the adequacy of a warning relates not to the element of
control, but to the second prong of Section 95.003 relating to whether the
property owner had actual knowledge of the danger and failed to warn.  Tex.
Civ. Prac. & Rem. Code Ann. ' 95.003 (Vernon
1997).

Dyall next argues that Simpson exercised
control Aby allowing [him]
to continue work on leaking chlorine dioxide without a face shield, goggles and
without respirators.@ 
This is simply another way of saying Simpson exercised control by not
exercising control.   The record reflects
Carter and Dyall wore goggles and gloves during the attempted repairs.  They had respirators in their truck, but
chose not to use them.  Carter admitted
they should have worn their respirators if only to protect them from the fumes
of their own Hydro-plug mixture, but did not do so.








Dyall next claims Simpson exercised
control Aby failing to
shut-down and clear the area of the facility leaking toxic chemicals, as
required by Simpson=s safety procedures.@  Dyall cites the testimony of Paul Licata, an
environmental and safety manager for Simpson. 
Licata testified that a person working in the vicinity of a chlorine
dioxide leak should have respiratory protection.  However, he also testified that it is
virtually impossible for a person to remain in the vicinity of a chlorine
dioxide leak due to its pungent odor and irritability.  Licata did not testify, as Dyall seems to
suggest, that Simpson had an internal policy requiring the shut-down and
evacuation of the facility where an odorless solution containing only traces of
chlorine dioxide is discovered to be leaking.

Finally, Dyall contends Simpson exercised
control Aby breaching its
responsibility to discuss general hazards with contractors.@  Dyall again cites the testimony of Paul
Licata who stated it was Simpson=s responsibility
to discuss general hazards with contractors including exposure to chlorine
dioxide water.  As noted earlier, Carter
and Dyall could not recall whether they were advised by Simpson that the
substance leaking from the broken flange possibly contained trace amounts of
chlorine dioxide.  However, even if
Simpson did not properly apprise Carter and Dyall of the danger and, thus,
breached a duty to them, we fail to see how such breach constitutes Acontrol.@  The breach of a duty leading to a cause of
action for negligence is the subject of Chapter 95 of the Texas Civil Practice
and Remedies Code.  This provision states
that claims Afor damages caused by negligence@ are not viable
against a property owner unless he exercised or retained control and had actual
knowledge of the danger without adequately warning the injured party.  Tex.
Civ. Prac. & Rem. Code Ann. '' 95.001(1) &
95.003 (Vernon 1997).  Thus, breach of a
duty is not equivalent to Acontrol.@

After considering all of Dyall=s proposed
examples of evidence of Acontrol,@ we find none can
reasonably be characterized as Acontrol over the
manner in which the work is performed.@  Tex.
Civ. Prac. & Rem. Code Ann. ' 95.003 (Vernon
1997).








Legislative
Intent

Even if the summary judgment proof fails to satisfy the
plain wording of Section 95.003, Dyall contends the legislature never intended
the statute to apply to a scenario like the one presented here.  Dyall relies on a statement of legislative intent made by the
bill=s sponsor, Representative Robert
Junell:

It is the legislative intent of the authors that
Chapter 95, Property Owner=s Liability for Acts of Independent Contractors and
Amount of Recovery, does not apply nor raise the burden of proof in situations
where a property owner is negligent, separate and apart from exercising or
retaining control over the manner in which the work is performed in a contract
to construct, repair, renovate or modify an improvement to real property.

Example:  Let=s say there is a concrete company supplying concrete
to a plant and because of premise owner=s
negligence (such as failing to properly maintain their pipelines, vessels or
pressures), there is an explosion destroying the concrete truck and injuring
the driver.  Nothing in this Chapter
would raise the burden of proof on the property owners negligence for recovery
of the damages related to the truck or person.

Example: 
Likewise, if we have a maintenance contractor who gets a contract to
perform work at the plant, and the property owner informs the contractor that
the lines are clear and ready for welding, when in fact they are not, due to
the property owner=s negligence, and an employee of the maintenance
contractor is injured by the release of chemicals.  Nothing in this chapter would change the
burden of proof or the damages recoverable.

H.J. of Tex., 74th
Leg., R.S. 2611B12 (1995). 








The statement of legislative intent, however, does not
support Dyall=s contention. First, when a statute
is clear and unambiguous, we need not resort to extrinsic aids to construe
it.  St. Luke=s Episcopal Hosp. v. Agbor, 952 S.W.2d 503, 505 (Tex. 1997); Bridgestone/Firestone,
Inc. v. Glyn-Jones, 878 S.W.2d 132, 133 (Tex 1994).  Dyall has made no argument that Section
95.003 is ambiguous.  Accordingly, in
determining the legislative intent behind Chapter 95 of the Texas Civil
Practice and Remedies Code, we look solely at the plain and common meaning of
the words of the statute.  Monsanto
Co. v. Cornerstones Mun. Util. Dist., 865 S.W.2d 937, 939 (Tex. 1993);  Moreno v. Sterling Drug, Inc., 787
S.W.2d 348, 352 (Tex. 1990).

Second, even if we were to rely on the author=s stated intent, we fail to see how
Representative Junell=s explanation of the statute differs from the plain meaning
of the words used therein.  If Dyall had
been injured by an unrelated explosion of the pine bleaching plant due to
Simpson=s negligence, the statute would not
preclude recovery.  Likewise, if Simpson
had negligently told Carter and Dyall that the pipe was empty, and Dyall had
been injured due to his reliance on that statement, again the statute would not
preclude recovery.  However, neither
scenario is presented here.  In fact, the
summary judgment evidence shows just the opposite.

Carter and Dyall were specifically told the pipe was not
empty.  Even before starting their repair
work, Carter and Dyall could plainly see a liquid dripping from the
flange.  Likewise, Carter admitted that a
Simpson employee may have told them the liquid contained chlorine dioxide.  Moreover, the leak was within 25 feet of a
sign warning of the presence of chlorine dioxide and recommending the use of
chemical goggles, face shield, and respirator. 
Finally, we do not interpret a statement by a Simpson employee that the
men might not need full air packs as an instruction or directive that they
should proceed without the benefit of such packs.  To the contrary, the only specific
instruction Simpson gave to Dyall and Carter regarding their manner of work was
to be careful and take the time necessary to get the job done right.

Knowledge of the
Danger








Finally, Dyall suggests that because Simpson was aware of
the danger and failed to adequately warn of the same, it necessarily exercised Acontrol@ over the manner
in which the work was performed.  Dyall states in his appellate brief,
for example, that Simpson exercised control because it Aowed [him] a duty to provide a safe
work place, but did not warn [him] of the known danger of exposure.@ 
In support of his position, Dyall relies heavily on the testimony of Dr.
Frank Stevens, his expert witness.  Dr.
Stevens testified that in his opinion Simpson exercised control of the Asituation.@ 
But when asked for the basis of his opinion, Dr. Stevens was quite
vague:

Well, first of all, they=re the ones that call IPP out to say,
AHere=s a project that we need to be
performed,@ and all C and, you know, here=s where C here=s where it is, and C and it=s implied that, you know, they took
responsibility to make sure that the lines are purged and, you know, that=s C that=s part of their control.

Thus, it seems Dr. Stevens was of the opinion that Acontrol@ is established merely by soliciting
the services of an independent contractor and directing him to the problem he
is to fix or repair.  Interestingly, when
shown Chapter 95 of the Texas Civil Practice and Remedies Code, Dr. Stevens
said it was the first time he had ever read the statute and that he had never
heard of Chapter 95 until it was mentioned by Dyall=s attorney a few hours before the
deposition.

Nevertheless, Dyall argues that because Simpson knew the
chemical leaking from the broken flange might contain trace amounts of chlorine
dioxide, it necessarily exercised Acontrol@ over the work by not advising him of
the hazards of working on the flange without respiratory protection.  We disagree.

The first problem with Dyall=s position is that
it effectively repeals Chapter 95.  Dyall
would have us hold that the element of Acontrol@ can be supplied
by proof of Aknowledge.@  This, of course, would eliminate the first
prong of the statute.








The second problem with Dyall=s position is that
he presented no evidence of Aknowledge.@  Thus, even if his interpretation of the
statute could be harmonized with the plain wording of Chapter 95, there is no
evidence in the summary judgment record to show Simpson had actual
knowledge of the danger from which control could be inferred.[18]

Simpson moved for summary judgment only on the ground that it
exercised no control, not that it lacked knowledge of the danger.  Thus, we would ordinarily restrict our
analysis solely to evidence of control. 
However, Dyall=s contention is that Simpson exercised Acontrol@ by failing to warn him of the danger
posed by chlorine dioxide.  When, as
here, the contention is made that proof of Aknowledge@ satisfies the requirement of Acontrol,@ the plaintiff is logically obliged
to offer some evidence of Aknowledge.@[19] 
Dyall, however, produced no summary judgment evidence to show either
Simpson=s Acontrol@ over the work or its Aknowledge@ of the danger.








The summary judgment evidence shows Simpson was aware that
pure chlorine dioxide was being pumped through the pipe when the leak was first
discovered.  The line was then shut down
for a day and purged with water. 
Thereafter, the liquid dribbling from the line had no chlorine odor, and
Simpson employees believed it to be virtually pure water that presented no respiratory
hazard.[20]  In fact, Simpson employees worked within five
to ten feet of Carter and Dyall without protective equipment.  Moreover, when Carter and Dyall were unable
to repair the leaking flange, Simpson employees ultimately replaced it without
the benefit of protective equipment. 
Nothing, therefore, in the record before us suggests Simpson was aware
of the danger and knowingly exposed Carter and Dyall to chlorine dioxide.

Accordingly, we find no merit in appellants= contentions;  thus, summary judgment was properly granted
for Simpson based upon section 95.003(1).

Common-Law Negligence

In the alternative,
Dyall contends the trial court erred in granting summary judgment because
Chapter 95 is not applicable to his claim for damages arising out of common-law
negligence.

Such an argument belies the clear
language of the statute.  A property
owner is entitled to the defense provided by Chapter 95 for claims Afor damages caused by negligence.@ 
Tex. Civ. Prac. & Rem. Code
Ann. ' 95.001(1) (Vernon 1997); see also
Kelly, 27 S.W.3d at 569 (applying Chapter 95 to assertions of negligence,
negligence per se, res ipsa loquitur, and negligent misrepresentation).  No distinction is made for negligence claims
arising under common law.  Accordingly,
Dyall was required to surmount the defense provided by Chapter 95 as to all of
his claims that sounded in negligence.

The judgment of the trial court is affirmed.

 

 

/s/        J. Harvey Hudson

Justice

 

 

Judgment rendered and Majority and
Dissenting Opinions on En Banc Rehearing filed November 24, 2004.  (Chief Justice Hedges, Justices Anderson,
Edelman, Frost, and Guzman join this opinion; Justice Fowler authored a
dissenting opinion in which JusticesYates and Seymore join).











[1]  Although the
parties agree on most of the underlying facts, the summary judgment record
contains conflicting statements regarding some of the events relating to the
accident.  Accordingly, we view the
summary judgment evidence in the light most favorable to Dyall.  Blackburn v. Columbia Med. Ctr. of
Arlington Subsidiary, L.P., 58 S.W.3d 263, 269 (Tex. App.CFort Worth 2001, pet. denied).





[2]  Stiles said he
would not ordinarily alert an independent contractor to the presence of
chlorine dioxide or suggest protective equipment if the exposure level was so
low that no odor of the chemical could be detected.





[3]  Paul Licata,
an environmental and safety manager for Simpson, testified that if the liquid
had contained anything more than a trace of chlorine dioxide it would have been
immediately apparent to anyone in the area due to its pungent odor and
irritability.  In fact, Licata testified
that if the flange had been leaking chlorine dioxide, there would have been no
need to advise Carter and Dyall of the danger because the pungent odor and
irritation would have made it impossible for anyone to work in the area without
protective equipment.  Licata also said
that while it would have been physically impossible for anyone to remain in the
vicinity of a chlorine dioxide leak, he would never knowingly allow an
independent contractor to work in the vicinity of chlorine dioxide without
goggles and a respirator.  James Bueker,
the bleach plant superintendent also testified that he would not knowingly
allow an independent contractor to work on a chlorine dioxide leak without a
respirator.





[4]  Dyall
testified as follows:

Q.  And he asked you guys to
repair a flange that was leaking?

A.  Correct.

Q.  Did he tell you what was
leaking?

A.  No.  I don=t recall
him saying what was leaking, just the flange was leaking.

Q.  Can you tell me, as you sit
here right now, whether or not it was ever discussed as to what was leaking?

A.  Not that I recall at that
time, no.

Q.  Would it be fair to say that
he may have told B or discussed what was leaking, you just don=t remember?

A.  I don=t recall discussing that, no.

Q.  May have, may not have, just
can=t remember?

A.  I just can=t remember.

Carter testified similarly:

Q.  And I think you testified
earlier B and I could be wrong B but I
thought you testified earlier that you can=t
remember if someone told you about working on ClO2.

A.  Correct.

Q.  So they may have, they may
not have, you just don=t remember.

A.  Right.





[5]  Dyall does not
contend (nor is there any evidence in the record) that the foam was toxic or
that it was the cause of Dyall=s alleged injuries. 





[6]  The testimony
of Carter and Dyall was contradicted in this respect by Stiles who said he was
within five feet of the men while they worked on the flange and the liquid was
at all times clear.  Stiles, who had
previously been exposed to chlorine dioxide on numerous occasions, testified
that if the liquid had contained any color, it would also have had the pungent
odor of chlorine.  Carter and Stiles
agreed that there was no odor of chlorine emanating from the leaking fluid.





[7]  Because the
leaking flange was located only one to three inches above the ground, it is
difficult to conceive how the liquid could have dripped on Dyall=s hands, arms, legs, and knees.  Moreover, as Carter=s helper, Dyall did not work directly on the leaking
flange.  Carter testified:

Q.  Okay.  You are at the site of the pipe, decide that
you=re going to use Hydro-plug, you have Wallace [Dyall]
mix it.  And what?  Does he pass it to you and you take it and
start packing it [on the flange]?

A.  Yes.

Q.  And I guess you=re down on your knees because the pipe is so close to
the ground?

A.  Correct.

* * *

Q.  To your knowledge, did Mr.
Dyall do anything other than get things for you and mix Hydro-plug?

A.  To my knowledge, that=s it.

Q.  If he said that he was
working on the pipe and flange with you, do you disagree?

A.  Yes.

Q.  If he said that the pipe and
flange he was working on was dripping all over his shirt sleeves and down his
pant legs, does that make any sense to you?

A.  No, it doesn=t.

Q.  You disagree with that?

A.  Yes, I do.

Q.  Were you the only one that
was trying to fix this pipe?

A.  Yes.





[8]  Carter
testified:

Q.  Did Mr. Dyall indicate that
he wasn=t feeling well after y=all
started working on that liquid?

A.  Yes.  I would say about an hour.

Q.  What did he say?  What kind of symptoms was he complaining
about?

A.  It was the smell from the
Hydro-plug is what B You know, what I smelled is possibly what he
smelled.  He said he was choking, you
know, coughing.

Q.  When you were working around
the leak, did you also have any problems with your breathing?

A.  Only when I used the
Hydro-plug, the ammonia smell just like (indicating) B it=s a smell you don=t B 

Q.  So Mr. Dyall was complaining
about choking and he was choking and coughing? 
You heard him choking and coughing?

A.  Yes, I heard him cough, yes.





[9]  Dyall=s testimony on this matter was contradicted by
Carter.  Carter testified that he was
nauseous and not feeling well before he ever entered the Simpson facility.  After leaving the Simpson plant, Carter and Dyall
were thirsty, and they dropped by a convenience store to purchase some beverages.  Carter purchased chocolate milk.  However, the milk had a sour taste, and
Carter did not finish it.  Later, as
Carter was returning to the Simpson plant, he vomited.

Carter recalls Dyall mentioned he also was
not feeling well, but he had no recollection of Dyall ever vomiting.  As the two men were preparing to leave the
Simpson plant for the second and final time, Carter noticed that Dyall was
pale, and he asked Dyall if he was feeling alright.  Dyall replied that he was fine.





[10]    In Redinger
v. Living, Inc., for example, the occupier of property, i.e., a
general contractor, was liable for injuries sustained by one subcontractor when
he was struck by the tractor of another contractor after the general contractor
had ordered both subcontractors to perform their work within a few feet of each
other.  689 S.W.2d 415, 417B18 (Tex. 1985).





[11]  This category
was for those defects that existed on the premises when the independent
contractor entered upon the property or that were created through some means
unrelated to the activity of the independent contractor.  In this situation, the owner or occupier of
the property had a duty to inspect the premises and warn the independent
contractor of those dangerous conditions of which the owner knew or should have
known.  Clayton W. Williams, Jr., Inc.
v. Olivo, 952 S.W.2d 523, 527 (Tex. 1997).





[12]  Richard O.
Faulk, Dispelling the Myths of Asbestos Litigation: Solutions for Common Law
Courts, 44 S. Tex. L. Rev. 945,
972 (2003). 





[13]  George C.
Hanks, Jr., When Sticks and Stones May Break Your Bones: An Overview of
Texas Premises Liability Law for Business Owners, 60 Tex. B.J. 1010, 1021 (1997).





[14]  Id.





[15]  Both Aconditions must be met before liability will be
imposed upon the property owner.@  Kelly, 27 S.W.3d at 567.





[16]  Chapter 95
represents an affirmative change in Texas tort law.  Prior to the adoption of Chapter 95, an owner
was potentially liable for injuries sustained by an independent contractor  even when the danger was readily apparent to
the contractor and the owner exercised no control.  For example, in Chilton v. Southwestern
Bell Mobile Systems, Inc., No. 05-94-01825-CV, 1996 WL 253334, (Tex. App.CDallas May 1, 1996, writ denied) (not designated for
publication), the plaintiff was hired to perform maintenance and repair work on
a one-hundred-foot tall cellular transmission tower.  Id. at *1.  It was readily apparent that the service line
(a mechanized pulley system for climbing the tower) was not working properly
and the sleeve on the safety climb cable was not located at the bottom of the
cable where he could attach a carabiner. 
Id. at *3.  The plaintiff
decided to work around these problems by physically climbing the tower without
benefit of basic safety equipment.  He
subsequently fell from a height of sixty to eighty feet.  The court of appeals held the owner was
potentially liable for plaintiff=s
injuries under a premises liability theory. 
Id. at *3.

Likewise, in Samco Properties, Inc. v.
Cheatham, 977 S.W.2d 469 (Tex. App.CHouston
[14th Dist.] 1998, pet. denied), the owner was liable for injuries to an
independent contractor who, unbeknownst to the owner, climbed into the interior
of an outdoor sign that was never designed or intended for human entry.  The injured party was an electrician employed
by an independent contractor who fell while performing maintenance on a large
commercial sign mounted on a pole 45 feet above the ground.  Although the sign was not designed or
constructed for human entry, two holes, approximately 10 inches by 18 inches
were located on the top of the sign to permit access to the fluorescent
lighting ballast.  In an effort to chase
pigeons out of the interior of the sign, the decedent was raised to the top of
the sign in a lift bucket.  He then
climbed through one of the aforementioned holes without a safety belt, and fell
out of the bottom side of the sign a few moments later when he either slipped
or stepped upon the thin aluminum Afloor@ of the structure. 
Under these facts, this court held that even though the owner did not
supervise the work or observe the contractor=s
activities, the owner had a duty, nevertheless, to provide suitable warnings to
the contractor.  Id. at 476.

Moreover, prior to the passage of Chapter
95, the owner or occupier of property who retained a right of control could be
liable for injuries related to premises defects about which he had no
knowledge.  In Clayton W. Williams,
Jr., Inc. v. Olivo, for example, the Texas Supreme Court held the occupier
of property, retaining a right of control, may be subject to liability when the
employee of an independent contractor is injured by a dangerous condition created
by the independent contractor if the occupier of the property knew or
should have known that the independent contractor had carelessly done his
work in such a way as to create a dangerous condition, and the occupier of the
property failed to exercise reasonable care either to remedy it himself or by
the exercise of his control cause the independent contractor to do so.  952 S.W.2d at 529.

It is doubtful that any of the foregoing decisions
would survive analysis under the standards promulgated by Chapter 95.





[17]  Dyall
testified:

Q.  Would it be fair to say that
the gentleman that showed you where the area [of the leak] was didn=t tell you how to do the repair work?

A.  No.

Q.  That=s not fair?

A.  He didn=t tell us how to do the repair work.

Q.  That=s why you guys were out there?

A.  Right.

Q.  Because y=all are, I guess, the experts in fixing this type of
work?

A.  Yes.

Q.  You=re supposed to be?

A.  I guess.

Q.  That=s why you=re
there?

A.  Right.

Q.  And that=s what you and Joey [Carter] were out there for?

A.  Right.

Q.  And would it be fair to say
that the entire time that you were at the Simpson plant that no Simpson people
told you or Joey how to fix that flange?

A.  To my recollection, no.





[18]  As this Court
observed in Bishop v. Nabisco, Inc., No. 14-03-00639-CV, 2004 WL 832916,
at *3 (Tex. App.CHouston [14th Dist.] Apr. 20, 2004, no pet. h.),
knowledge that an activity is potentially dangerous is not sufficient to
satisfy the second prong of Section 95.003 C  actual knowledge of the danger is required.





[19]  While Dyall=s assertion that the element of Acontrol@ can be
satisfied by proof of Aknowledge@ is
erroneous, we simply observe that his own theory of  prosecution requires him to produce evidence
of Aknowledge.@





[20]  It is common
knowledge that chlorine is highly toxic. 
City of Jackson v. Ball, 562 So.2d 1267, 1269 (Miss. 1990). In
fact, it has been used as a chemical warfare agent.  Valentine v. Pioneer Chlor Alkali Co., Inc.,
921 F. Supp. 666, 673 (D. Nev. 1996). 
However, the odor of chlorine is identifiable by most persons because
chlorine is used so commonly as a disinfecting agent in drinking water and
swimming pools, and it is the active ingredient in many household bleaches,
general germicides, and deodorants.  See
Erbrich United States v. FMC Corp., 306 F. Supp. 1106, 1111 (D. Pa. 1969); Products
Co., Inc. v. Wills, 509 N.E.2d 850, 856 (Ind. App. 1st Dist. 1987).  Where, as here, the odor of chlorine was not
present in the liquid leaking from the flange, Simpson employees assumed that
any chlorine dioxide residue in the liquid was so minuscule as to present no
toxic hazard.